**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| BILLIE JOANN HARMON, on behalf of herself and others similarly situated, ) ) ) ) Plaintiff, ) ) vs. ) ) FIFTH THIRD BANCORP,[1] ) ) Defendant. ) | Case No.: 1: 18-cv-00402<br><br>Judge Michael R. Barrett |

## OPINION AND ORDER

This matter is before the Court on Defendant Fifth Third Bank's Motion to Dismiss. (Doc. 28). Plaintiff Billie Joann Harmon filed a Response in Opposition (Doc. 32) and Defendant filed a Reply (Doc. 35). Plaintiff also filed a Notice of Supplemental Authority to which Defendant responded and Plaintiff replied. (Docs. 40, 21, 42).

### I. BACKGROUND

Plaintiff has a personal Essential Checking account[2] with one of Defendant's Kentucky branches. (Doc. 23, ¶¶ 11, 49). Defendant "is a state-chartered, federally insured bank headquartered in Ohio, with branches in several states, including Ohio, Michigan, Kentucky, and Tennessee." *In re Fifth Third Early Access Cash Advance Litig.*, 925 F.3d 265, 269-70 (6th Cir. 2019). Plaintiff's lawsuit is based on her use of one of

---

[1] Defendant asserts that "Fifth Third Bank, not Fifth Third Bancorp, is the proper party here" as "Fifth Third Bancorp is a bank holding company with which [Plaintiff] has no contractual relationship." (Doc. 28, PageID 264, n.1).

[2] Other types of checking accounts offered by Defendant appear to be Enhanced Checking and Preferred Checking. *See* (Doc. 23-1, PageID 216-17); (Doc. 23-2) ("Consumer Account Pricing & Services").

Defendant's mobile banking products, "Mobile Deposit," using her Essential Checking account. (Doc. 23).

Defendant's Mobile Deposit product enables certain account holders to deposit properly endorsed checks into certain types of accounts with their mobile device's camera and Defendant's mobile banking application ("app"). (*Id.*, ¶¶ 16, 17). Mobile Deposit is governed by the Deposit Account Rules & Regulations Agreement and Digital Services User Agreement. *See* (Doc. 23-1) ("Deposit Account Rules & Regulations, Privacy Policy, How to Contact Us," issued February 2018 (hereinafter "Deposit Account Rules & Regulations")); (Doc. 23-3, PageID 233, 238) ("Digital Services User Agreement & Electronic Communication Disclosures (e-Sign Consent Agreement)" (hereinafter "Digital Services User Agreement")).

### a. Agreements

The first agreement, the Deposit Account Rules & Regulations Agreement, contains a section titled "Funds Availability for Transaction Accounts" that discusses the availability of different types of deposits—*e.g.*, cash, transfers between Fifth Third accounts, mobile deposits, electronic direct deposits, and wire transfers—for withdrawal (Doc. 23-1, PageID 200-04). Pertinent here, the Deposit Account Rules & Regulations Agreement's Funds Availability section states that Defendant will make the following deposits immediately available (for same-day cash withdrawals and purchases, to pay checks, withdrawals, purchases, and to cover any items that may post to one's account that night): (1) "Mobile Deposits *using Fifth Third's 'Immediate Funds' Service*" and (2) "Personal Accounts: $100 of your total check deposits made in any manner (Banking

Center, ATM, Mobile Deposit *using standard availability service*)."[3] (*Id.*, Page 202) (emphasis added).

The Deposit Account Rules & Regulations Agreement also contains a section titled "Pricing and Services Applicable to Consumer Deposit Accounts" that discusses the pricing involved for banking products for different types of banking accounts. (*Id.*, PageID 216-17). This section directs checking account holders, including Express Checking account holders, to "[r]efer to the 'Funds Availability' section" of that Agreement for the "Funds Availability Policy." (*Id.*, PageID 217).[4]

The second agreement, the Digital Services User Agreement, made available to account holders through Defendant's mobile banking app or online, states that, "[b]y using Fifth Third . . . Mobile Banking . . . you agree to be bound by the terms and conditions contained in this Agreement." (Doc. 23-3, PageID 235). The Digital Services User Agreement also states that it "is provided by [Defendant] to govern the use of Fifth Third Digital Services which include . . . Mobile . . . services" and that "Digital Services provided by Fifth Third are additionally governed by any other separate agreement(s) you may have with Fifth Third or any of its affiliates or subsidiaries, including, but not limited to, Rules and Regulations . . . " (*Id.*, PageID 233).

The Digital Services User Agreement's section titled "Fees for Services" provides:

---

[3] The Funds Availability section states that, for personal accounts using Mobile Deposit using the Standard Availability Service, account holders will receive the remainder of their funds either later that same business day or on the next business day, depending on whether the check was a Fifth Third check or a non-Fifth Third check. *Id.*

[4] The document titled "Consumer Account Pricing & Services" (Doc. 23-2) contains the same information as the Deposit Account Rules & Regulations Agreement's Pricing and Services Applicable to Consumer Deposit Accounts section and the Deposit Account Rules & Regulations Agreement's Terms & Conditions Applicable to Fifth Third Express Banking section, with the exception of the exclusion of the Express Banking Tier Pricing effective through April 13, 2018. *Compare* (Doc. 23-1, PageID 209-10, 216-17), *with* (Doc. 23-2).

> Some of the Digital Services may have fees associated with them that are not included in the Fifth Third Bank Rules and Regulations Applicable to All Accounts or Terms and Conditions Applicable to Express Banking. Information regarding such fees will be included within the applicable service. Please review such fees prior to engaging in a transaction.

(*Id.*, PageID 237).

The Digital Services User Agreement's section titled "Fifth Third Mobile Deposit & Mobile Deposit with Immediate Funds" states that:

> If you use Mobile Deposit or Mobile Deposit with Immediate Funds [ ], the following terms apply to you:
>
> **1**. **Features and Services**. Fifth Third Mobile Deposit allows you to deposit money into certain accounts with your mobile device camera using the Fifth Third Mobile Application [ ]. *To use Mobile Deposit, you must be a Fifth Third account holder and have agreed to the Digital Services User Agreement.* . . .
>
> . . .
>
> **4**. **General Information on Fifth Third Mobile Deposit with Immediate Funds.**
>
> Fifth Third Mobile Deposit with Immediate Funds ("Immediate Funds") is a service that Fifth Third may provide to its checking, savings, or Express Banking account holders.
>
> o Immediate Funds allows you to immediately access the full amount of the mobile deposit.
>
> o *A service fee may apply for Immediate Funds.* We may not charge for checks under a certain dollar amount. *Fifth Third does not charge a service fee for using the standard Mobile Deposit process.*
>
> o The fee, if any, is based on the amount of the check and the check type.
>
> o You have the option to accept this fee before proceeding with each transaction.
>
> o Please see the <u>Mobile Banking FAQs</u> for more information on the current fees and additional details on Immediate Funds.

4

. . .

(*Id.*, PageID 238) (bold emphasis in original) (italicized emphasis added). Further, the Digital Services User Agreement's section titled "Fees," states that Defendant "reserve[s] the right to impose a fee and to change fees upon notice to you." (*Id.*, PageID 246).

### b. Mobile Deposit: Standard Availability Service and Immediate Funds Service

Account holders have two options regarding how the deposit checks using Mobile Deposit on Defendant's banking app. The options differ regarding the availability of the funds from deposited checks and the service fee, or lack thereof, charged. The options are Standard Availability Service, the app's default option, and Immediate Funds Service, the app's non-default option that account holders can elect. (Docs. 23-1, 23-3).

Using the Standard Availability Service, account holders can immediately obtain "$100 of [their] total check deposits, made in any manner (Banking Center, ATM, Mobile Deposit using standard availability service)." (Doc. 23-1, Page ID 202). Defendant does not charge a service fee for using the Standard Availability Service. (Doc. 23-3, PageID 238).

Using the Immediate Funds Service, account holders can elect to immediately obtain the full amount of their check deposits. (Doc. 23-1, Page ID 202). Defendant may charge the account holder a service fee that is based on the entire check amount and type of check, and account holders have the option to accept the service fee before proceeding with each deposit. (Doc. 23-3, PageID 238). For example, if the account holder initiates the process to elect to use the Immediate Funds Service, Defendant's banking app displays the amount of the specific service fee for that deposit before giving the account holder the option to finalize her selection of the Immediate Funds Service

(versus depositing the check using the default Standard Availability Service). (Doc. 23, ¶ 39). Similarly, before finalizing her selection of the Immediate Funds Service, Defendant's app displays an "information" icon, that the account holder can tap and, if the account holder so taps, explains that the deposited funds are guaranteed, guaranteed funds are verified by a third party, the depositor has no liability for losses associated with these items, and there is a minimum service fee of $4 for checks over $20. (*Id.*, ¶¶ 43, 45).

Plaintiff, using her Essential Checking account, has used Mobile Deposit's Immediate Funds Service and, as a result, has incurred service fees on her mobile deposits. (*Id.,* ¶¶ 49-51). The Court does not have the specific pricing structure for the service fees for the Immediate Funds Service for Essential Checking account holders at the times that Plaintiff elected to use the Immediate Funds Service; however, Plaintiff asserts that, "[f]or each deposit made on the 5/3 app with 'Immediate Funds Availability,' 5/3 charges either a $4 minimum or between 2%-4% of the total check amount." (*Id.*, ¶ 7).

### c. Express Banking

In addition to Defendant's various types of checking accounts, it also offers a product called "Express Banking."[5] (Doc. 23-1, PageID 208-10). In February 2016, Defendant "launched Express Banking . . . to meet the biggest needs of the underbanked:

---

[5] Express Banking account holders, unlike typical checking account holders, have no check writing capabilities and have restrictions on how they can deposit checks. (Doc. 23-1, PageID 208). For instance, although Express Banking account holders' employers or government agencies can utilize Direct Deposit to place funds in Express Banking accounts, Express Banking account holders cannot deposit checks directly into their accounts at a Fifth Third Banking Center, ATM, Fifth Third Night Depository, or by mail. *Id.* Rather, they can cash checks in-person using Fifth Third's check cashing solution and then deposit that cash directly into their Express Banking account, with a fee. *Id.* Express Banking account holders can also deposit a check using Mobile Deposit using Fifth Third's Immediate Funds Service, also with a fee. *Id.* It is not clear, based on the record, whether Express Banking account holders can deposit a check using the Standard Availability Service.

a solution that is simple, transparent, convenient and affordable." (Doc. 23, ¶ 20) (citing Press Release, *Fifth Third Bank Launches Express Banking<sup>SM</sup> to Serve the Unbanked and Underbanked*, Feb. 3, 2016). Plaintiff does not have an Express Banking Account, and characterizes Defendant's creation of the Express Banking product as doing business "in a high-fee manner that exploits low-income customers' desperation to access their own funds." (*Id.*, ¶ 2).

Express Banking's "Loyalty Pricing" structure gives Express Banking account holders "the opportunity to earn discounts for the continued usage of qualifying transactions" and Defendant will graduate them through one of three Loyalty Tiers that provide discounts for certain banking services as account holders perform certain transactions. (Doc. 23-1, PageID 208). The Deposit Account Rules & Regulations Agreement contains a section titled "Terms & Conditions Applicable to Fifth Third Express Banking" that contains a subsection titled "Express Banking Pricing & Services." (*Id.*, PageID 208-10). That subsection contains the specific Express Banking Tier pricing structure for Mobile Deposits using the Immediate Funds Service. (*Id.*, PageID 210).

### d. **Amended Class Action Complaint and Motion to Dismiss**

Plaintiff brings this suit as a class action. (Doc. 23). In short, she asserts that Defendant promised to make the first $100 of a customer's check deposit, made in any manner, immediately available, for free; and, with respect to the first $100 of any mobile check deposit using the Immediate Funds Service, Defendant's service fee is improper and breaches that promise. *Id.* Plaintiff's Amended Class Action Complaint brings the following claims: breach of contract, breach of the covenant of good faith and fair dealing,

unjust enrichment, fraudulent inducement, and violation of the Truth in Lending Act and Regulation Z.[6] *Id.*

Defendant moves to dismiss Plaintiff's Amended Class Action Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. (Doc. 28). In short, Defendant asserts that it did not promise in the Agreements to make the first $100 of a customer's check deposit, made in any manner, immediately available, for free. *Id.*

## II. ANALYSIS

In deciding a Rule 12(b)(6) motion to dismiss, this Court must "construe the complaint in the light most favorable to the plaintiff, accept [the plaintiff's] allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (quoting *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007)). To avoid dismissal under Rule 12(b)(6), a plaintiff's complaint must contain "(1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'a formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'" *Tackett v. M&G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).

---

[6] She withdrew her claim under the Kentucky Consumer Protection Act. (Doc. 32, PageID 329, n1).

### a. **Breach of Contract**

To prove a breach of contract under Ohio law,[7] the following elements must be established: (1) the existence of a valid contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damages or loss to the plaintiff. *Samadder v. DMF of Ohio, Inc.*, 154 Ohio App. 3d 770, 778 (10th Dist. App. 2003). "A party breaches a contract if he fails to perform according to the terms of the contract or acts in a manner that is contrary to its provisions." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008) (applying Ohio law)).

"The 'interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court.'" *Devine Grp., Inc. v. Omni Hotels Corp.*, No. 1:18-CV-186 (WOB), 2019 WL 2870047, at *3 (S.D. Ohio July 3, 2019) (quoting *Savedoff*, 524 F.3d at 763). "When confronted with an issue of contract interpretation, [the court's] role is to give effect to the intent of the parties." *Id.* (quoting *Sunoco, Inc. (R&M) v. Toledo Edison Co.*, 953 N.E.2d 285, 292 (Ohio 2011)). "[T]he meaning of a contract is to be gathered from a consideration of all its parts, and no provision is to be wholly disregarded as inconsistent with other provisions unless no other reasonable construction is possible." *Id.* at *4 (quoting *Savedoff*, 524 F.3d at 763).

"Contractual language is ambiguous only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations." *Id.* Contractual "ambiguity must be patent, *i.e.*, apparent on the face of the contract." *Id.* "A contractual term is not ambiguous merely because—

---

[7] The parties agree that Ohio law governs Plaintiff's breach of contract claim. (Doc. 23, ¶ 66); (Doc. 28, PageID 276).

9

as in this case—two parties offer substantially different interpretations." *Id.* (quoting *Coma Ins. Agency v. Safeco Ins. Co.*, 526 F. App'x 465, 468 (6th Cir. 2013) (citation omitted) (internal quotation marks omitted)). "Under Ohio law, contract interpretation is a matter of law when a contract's terms are clear and unambiguous." *Pavlovich v. Nat'l City Bank*, 435 F.3d 560, 565 (6th Cir. 2006) (citing *Long Beach Ass'n, Inc. v. Jones*, 697 N.E.2d 208, 209-10 (Ohio 1998)). "And, a court may look no further than the writing itself to find the intent of the parties." *Devine Grp., Inc.*, 2019 WL 2870047, at *4 (quoting *Sunoco, Inc.*, 953 N.E.2d at 292.) (internal quotation marks omitted).

The parties agree that the Deposit Account Rules & Regulations Agreement and Digital Services User Agreement are valid contracts, Plaintiff selected the Immediate Funds Service on Defendant's banking app when depositing checks multiple times, and Plaintiff incurred multiple service fees as a result of her selections. *Compare* (Docs. 23, 32), *with* (Doc. 28, 35). The parties disagree that Defendant breached a promise in the Agreements. *Compare* (Docs. 23, 32), *with* (Doc. 28, 35). Plaintiff contends that Defendant promised to make the first $100 of a customer's check deposit, made in any manner, immediately available, for free and, regarding the first $100 of any mobile check deposit using the Immediate Funds Service, Defendant's service fee breaches that promise. *Id.* Defendant responds that no such promise exists, and the Agreements allowed it to charge Plaintiff the service fees for each use of the Immediate Funds Service. (Doc. 35). After a review of the Deposit Account Rules & Regulations Agreement and Digital Services User Agreement, and mindful that it must draw all reasonable inferences in favor of Plaintiff at this stage in the proceedings, the Court agrees with Defendant that

Plaintiff's argument is premised on a contractual promise that does not exist. (Doc. 35, PageID 361).

Plaintiff used Defendant's mobile banking app and consequently agreed to be bound by the terms and conditions contained in the Digital Services User Agreement, in addition to her earlier agreement to be bound by the Deposit Account Rules & Regulation Agreement. *See* (Doc. 23-3, PageID 235). Starting with a review of the Deposit Account Rules & Regulations Agreement, that Agreement does not discuss a service fee for either the Standard Availability Service or Immediate Funds Service for an Essential Checking account holder using Mobile Deposit; rather, the Agreement discusses only what amount of funds from Plaintiff's mobile check deposits will be available for withdrawal and when. (Doc. 23-1, PageID 202). And, in so explaining when her funds will be available, the Agreement differentiates between the Standard Availability Service and Immediate Funds Service. *Id.* In fact, in the entire Agreement, the only specific pricing structure regarding service fees for Mobile Deposit using the Immediate Funds Service is found in the Terms & Conditions Applicable to Express Banking. (*Id.*, PageID 208-10). However, that tier pricing structure is specific to Express Banking customers, Plaintiff does not have this type of account, and Plaintiff does not state that, or explain how, the Express Banking tier pricing structure also applies to Express Checking account holders.

Turning to the Digital Services User Agreement, this Agreement expressly discloses that: Defendant does not charge a service fee for using Mobile Deposit's Standard Availability Service on its banking app; a service fee may apply for selecting Mobile Deposit's Immediate Funds Service on the app; any service fee for the Immediate Funds Service will be based on the amount of the check and the type of check; and

11

Plaintiff should check online for the most current fees for the Immediate Funds Service. (Doc. 23-3, PageID 238). Thus, the Digital Services User Agreement also expressly differentiates between the service fee for a mobile deposit using the app's Standard Availability Service (no fee) and for a mobile deposit using the app's Immediate Funds Service (a service fee, so long as the check is over $20, the amount of which will be based on the amount of check deposit and check type). *Id.*

Moreover, the Digital Services User Agreement expressly provides that: Defendant reserves the right to impose a fee and to change fees upon notice to Plaintiff; some of the Digital Services may have fees associated with them that are not included in Deposit Account Rules & Regulations Agreement; and information regarding such fees will be included within the applicable digital service; and the Agreement directs Plaintiff to review such fees prior to engaging in a transaction. (Doc. 23-3, PageID 237, 246).

Reading the two Agreements together, they differentiate between the Standard Availability Service—$100 of an account holder's total check deposits made in any manner (Banking Center, ATM, Mobile Deposit using standard availability service) in a day are immediately available and Defendant will not charge a service fee for this service—and the Immediate Funds Service—the full amount of mobile deposits using the Immediate Funds Service are immediately available, and Defendant may charge a fee, based on the deposit amount and check type, for this service. (Docs. 23-1, 23-3).

Plaintiff's belief that, reading the two Agreements together, Defendant promised to make the first $100 of *any* mobile deposit, immediately available, *for free*, because the Deposit Account Rules & Regulations Agreement's Funds Availability's section provides that "$100 of your total check deposits made in any manner" will be immediately available,

12

is incorrect. (Docs. 23, 32) (relying on (Doc. 23-1, PageID 202)). Her interpretation would require the Court to simultaneously read "for free" into the Deposit Account Rules & Regulations Agreement's Funds Availability section and ignore the fact that the two Agreements distinguish the Standard Availaibility Service and the Immediate Funds Service in terms of the amount of check deposits made immediately available and whether a fee applies, and the Court cannot do so. *See* (Doc. 23-1, PageID 202); (Doc. 23-3); *see also Savedoff*, 524 F.3d at 763 ("[N]o provision is to be wholly disregarded as inconsistent with other provisions unless no other reasonable construction is possible."); *Impressions Bldg., LLC v. Heart Specialists of Ohio, Inc.*, 2006-Ohio-4719, ¶ 8 ("It is well-established that a court cannot add or change terms of the contract when the language is clear and unambiguous.") (citing *Shifrin v. Forest City Enterprises, Inc.*, 597 N.E.2d 499 (Ohio 1992)).

The only reasonable interpretation of the Agreements is that Defendant did not promise to make the first $100 of all mobile deposits, immediately available, for free, and the Agreements unambiguously allow Defendant to charge Plaintiff the Immediate Funds Service fees after giving her notice of the specific service fee for each mobile deposit. *See Savedoff*, 524 F.3d at 763. *Accord Webb v. Republic Bank & Tr. Co.*, No. 3:11-CV-00423, 2013 WL 5447709, at *4 (W.D. Ky. Sept. 30, 2013) ("A breach of contract action may not be based on an act which the contract authorizes to be done.") (citation omitted) (internal quotation marks omitted); *PNC Bank NA v. Martin*, No. CIV.A. 08-649-C, 2011 WL 5507364, at *2 (W.D. Ky. Nov. 10, 2011) ("Because PNC acted within its rights provided by the Agreement, it did not breach its contract."). Plaintiff concedes that Defendant notified her of the Immediate Funds Service fee before she selected to utilize

13

the product on her app and that she agreed to pay the service fee. (Doc. 23, ¶¶ 39, 43, 45, 50); (Doc. 32, PageID 327-28, 332). The Court finds that Plaintiff has not stated a plausible claim for breach of contract, and dismissal is warranted.

### b. Breach of Covenant of Good Faith and Fair Dealing

The Court finds that Plaintiff's breach of the covenant of good faith and fair dealing claim must also be dismissed due to the Court's finding that dismissal is warranted for her breach of contract claim. *See Farnell v. Kenyon Coll.*, No. 2:18-CV-263, 2019 WL 1024961, at *3 (S.D. Ohio Mar. 4, 2019) ("As a matter of Ohio law, the covenant of good faith and fair dealing 'is part of a contract claim and does not stand alone as a separate cause of action from a breach of contract claim.'") (quoting *Interstate Gas Supply, Inc. v. Calex Corp.*, 2006-Ohio-638 at ¶ 98); *see also Krukrubo v. Fifth Third Bank*, 2007-Ohio-7007, ¶ 19 ("In essence, a claim for breach of contract subsumes the accompanying claim for breach of the duty of good faith and fair dealing. Because appellant's complaint fails to state a claim for breach of contract, it also fails to state a claim for breach of the duty of good faith and fair dealing.").

### c. Unjust Enrichment

Under Ohio law "[u]njust enrichment is an equitable doctrine to justify a quasi-contractual remedy that operates *in the absence of an express contract or a contract implied in fact* to prevent a party from retaining money or benefits that in justice and equity belong to another." *Wuliger v. Manufacturers Life Ins. Co.*, 567 F.3d 787, 799 (6th Cir. 2009) (quoting *Beatley v. Beatley*, 828 N.E.2d 180, 192-93 (Ohio 2005) (emphasis added) (citations omitted) (internal quotation marks omitted). "Ohio law is clear that a plaintiff may not recover under the theory of unjust enrichment or quasi-contract when an express

14

contract covers the same subject." *Id.* (quoting *Lehmkuhl v. ECR Corp.*, No. 06 CA 039, 2008 WL 5104747, at *5 (2008)). The Deposit Account Rules & Regulations Agreement and Digital Services User Agreement cover the same subject as Plaintiff's breach of contract and unjust enrichment claims. *See* (Doc. 23). Consequently, dismissal of Plaintiff's claim for unjust enrichment under Ohio law is warranted. *See Wuliger*, 567 F.3d at 799.

### d. Fraudulent Inducement

To prevail on a claim of fraudulent inducement in Ohio, the plaintiff must establish that "the defendant made a knowing, material misrepresentation with the intent of inducing the plaintiff's reliance, and that the plaintiff relied upon that misrepresentation to her detriment." *Thornton v. Cangialosi*, No. 2:09-CV-585, 2010 WL 2162905, at *3 (S.D. Ohio May 26, 2010) (citing *ABM Farms, Inc. v. Woods*, 692 N.E.2d 574, 578 (Ohio 1998)). "[T]he existence of a contract action generally excludes the opportunity to present the same case as a tort claim." *Wolfe v. Continental Cas. Co.*, 647 F.2d 705, 710 (6th Cir. 1981); *accord Thornton*, No. 2010 WL 2162905, at *2. "A tort claim based upon the same actions as those upon which a claim of contract breach is based will exist independently of the contract action only if the breaching party also breaches a duty owed separately from that created by the contract, that is, a duty owed even if no contract existed." *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 684 N.E.2d 1261, 1270 (9th Dist. App. 1996) (citing *Battista v. Lebanon Trotting Ass'n*, 538 F.2d 111, 117 (6th Cir. 1976)); *accord Thornton*, 2010 WL 2162905, at *2.

Plaintiff's allegations regarding Defendant's alleged promise to make the first $100 of any mobile deposit immediately available for free in her fraudulent inducement claim

15

are the same allegations that form the basis of her breach of contract claim. *Compare* (Doc. 23, ¶¶ 65-70), *with* (Doc. 23, ¶¶ 88-95). She does not assert that Defendant made any misrepresentations collateral to, or outside of, the Agreements, or that Defendant had a separate duty outside of the Agreements. (Docs. 23, 32). Plaintiff's claim fails as a matter of law because the premise underlying her tort claim is the alleged failure to fulfill a contractual promise, and not any material, collateral misstatement of fact. *See Thornton*, 2010 WL 2162905, at *4; *Telxon Corporation v. Smart Media of Delaware, Inc.*, 9th Dist. Nos. 22098, 22099, 2005–Ohio–4931, at ¶ 38; *Textron Fin. Corp.*, 684 N.E.2d at 1270. Accordingly, this Court will dismiss this claim.

### e. Truth in Lending Act and Regulation Z

The Truth in Lending Act ("TILA") governs consumer credit transactions and "was enacted to promote the informed use of credit by consumers by requiring meaningful disclosure of credit terms."[8] *Begala v. PNC Bank, Nat'l Ass'n*, 163 F.3d 948, 950 (6th Cir. 1998). "Under TILA, creditors that extend credit to consumers must make certain disclosures, including, *inter alia*, (1) the amount financed; (2) the sum of the amount financed; and (3) the number, amount and due dates or period payments scheduled to repay the total of payments." *Wolfington v. Reconstructive Orthopaedic Assocs. II, P.C.*, 268 F. Supp. 3d 756, 761 (E.D. Pa. 2016), *aff'd sub nom. Wolfington v. Reconstructive Orthopaedic Assocs. II PC*, 935 F.3d 187 (3d Cir. 2019) (citing 15 U.S.C. § 1638(a)) (internal quotations marks removed). "A cause of action under TILA arises when a defendant fails to make these disclosures." *In re Fifth Third Early Access Cash Advance*

---

[8] "TILA is codified at 15 U.S.C. §§ 1601-1693 and its provisions are implemented by Title 12 of the Code of Federal Regulations Part 226 known as Regulation Z." *League v. Olds*, No. 3:13-CV-177, 2013 WL 829389, at *5 (M.D. Tenn. Mar. 5, 2013).

*Litig.*, 925 F.3d at 274 (citing *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412 (1998)). TILA defines "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(f).

The parties dispute whether Defendant's Immediate Funds Service is an extension of credit such that Plaintiff's use of the Immediate Funds Service is a consumer credit transaction covered by TILA. *Compare* (Doc. 28, PageID 292), *with* (Doc. 23, ¶ 100), *and* (Doc. 32, PageID 345-51). Plaintiff states that Defendant extends credit via the Immediate Funds Service "by 'loaning' to Plaintiff the amount of her check deposit with the expectation that Plaintiff will 'repay' this loan less the financing charge incurred by making Plaintiff's check deposit 'immediately available.'" (Doc. 32, PageID 349). However, Plaintiff's statement ignores her earlier concession that, by electing to use the Immediate Funds Service, her check amount is "guaranteed" and "'guaranteed funds are verified by a third party, and the depositor [*i.e.*, Plaintiff] has no liability [*i.e.*, no debt or obligation to repay the check amount after it is deposited] for losses associated with these items." (Doc. 23, ¶ 45).

Plaintiff contends that check funds deposited via the Immediate Funds Service are not actually guaranteed, *i.e.*, that she could incur debt or become obligated to repay the check amount after it is deposited, because of the following statements in the Digital Services User Agreement:

- Please note that any check that you attempt to deposit using Mobile Deposit is subject to verification by Fifth Third. We may reject an item for deposit for any reason and will not be liable to you.

- We are not responsible for items that we do not receive. Processing and/or transmission errors can occur after we acknowledge receipt that may impact transaction completion.

17

*Id.* (citing Doc. 23-3, PageID 238). However, the first statement does not indicate that Plaintiff will incur a debt; nothing in this statement contradicts the fact that, by electing to use the Immediate Funds Service, Plaintiff's deposited check amount is "guaranteed" and "[g]uaranteed funds are verified by a third party, and [Plaintiff] has no liability for losses associated with these items." *Compare id.*, *with* (Doc. 23, ¶ 45), *and* (Doc. 28-3)[9] (the display screen that Plaintiff saw when she tapped the "information" icon next to the Immediate Funds Service on Defendant's banking app); (Doc. 28-1, ¶ 8) (Defendant's representative declaring that (Doc. 28-3) is the display screen that Plaintiff saw). Plaintiff's reliance on the second statement in the Digital Services User Agreement similarly ignores the fact that, when using the Immediate Funds Service, her "[f]unds are immediately available in full as soon as the deposit is submitted successfully." *Compare* (Doc. 23-3, PageID 238), *with* (Doc. 23, ¶ 45), (Doc. 28-1, ¶ 8), *and* (Doc. 28-3).

In light of the above, the Court finds that the Immediate Funds Service is not an extension of credit to Plaintiff by Defendant and Defendant was not required to make any disclosures under TILA. *See* 15 U.S.C. § 1602(f). Plaintiff's TILA and Regulation Z claim will be dismissed for failure to state a claim for which relief can be granted.

---

[9] On a Rule 12(b)(6) motion, the Court "may consider . . . exhibits attached to defendant's motion to dismiss so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment*." Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 681 (6th Cir. 2011) (citation omitted) (internal quotation marks omitted). Plaintiff's First Amended Class Action Complaint refers to this display screen, (Doc. 23, ¶¶ 43-45), and the Court may consider Defendant's exhibit, *see Rondigo, L.L.C.*, 641 F.3d at 681.

### III. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Defendant's Motion to Dismiss (Doc. 28) is **GRANTED**. This matter is **CLOSED** and **TERMINATED** from the active docket of this Court.

**IT IS SO ORDERED.**

_s/ Michael R. Barrett_____
Michael R. Barrett, Judge
United States District Court